# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

CHERYL J. SORENSON,

        Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

No. C07-3053-MWB

**REPORT AND RECOMMENDATION**

---

## I. INTRODUCTION

The plaintiff Cheryl J. Sorenson seeks judicial review of a decision by an administrative law judge ("ALJ") denying her application for disability insurance ("DI") benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*. Sorenson claims the ALJ erred in assessing her residual functional capacity, and the ALJ incorrectly weighed the medical evidence. (*See* Doc. Nos. 6 & 8)

## II. PROCEDURAL AND FACTUAL BACKGROUND
### A. Procedural Background

On March 17, 2004, Sorenson filed an application for DI benefits, alleging a disability onset date of June 14, 2002. (R. 56-58). Sorenson claimed she was disabled due to depression and agoraphobia following her diagnosis with breast cancer and a resulting lumpectomy. She claimed her depression left her fatigued and unable to work. (*See* R. 77) Sorenson's application was denied initially and on reconsideration. (*See* R. 35-39) Sorenson requested a hearing, and a hearing was held on February 16, 2006, before Administrative Law Judge ("ALJ") Andrew Palestini. (R. 386-418) Sorenson was represented at the hearing by attorney Blake Parker. Sorenson testified at the hearing, and

Vocational Expert ("VE") William Tucker also testified. On January 31, 2007, the ALJ ruled that although Sorenson could not return to her past relevant work as a data entry clerk, receiving checker, stock clerk, or inventory clerk, she retained the residual functional capacity to perform other light, unskilled jobs such as laundry folder, production assembler, and inspector/hand packager. He therefore held Sorenson was not disabled. (R. 12-24) Sorenson appealed the ALJ's ruling, and on August 1, 2007, the Appeals Council denied her request for review, making the ALJ's decision the final decision of the Commissioner. (R. 6-9)

Sorenson filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. (Doc. No. 1) In accordance with Administrative Order #1447, dated September 20, 1999, this matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of the case. Sorenson filed a brief supporting her claim on November 6, 2007. (Doc. No. 6) The Commissioner filed a responsive brief on December 21, 2007. (Doc. No. 7) Sorenson filed a reply brief on December 28, 2007. (Doc. No. 8) The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Sorenson's claim for benefits.

## B. Factual Background

### 1. Introductory facts and Sorenson's hearing testimony

Sorenson was born in 1958. At the time of the hearing, she was 5'5" tall and weighed about 117 pounds. Her weight has fluctuated between 115 and 142 pounds due to stress, anxiety, medications, and agoraphobia. Her weight reached 142 pounds during the year prior to the ALJ hearing, when her agoraphobia kept her confined to her bedroom most of the time. She would only leave the room for very brief periods of ten or fifteen minutes to get food or use the bathroom. (R. 56; 389-90)

Sorenson has a driver's license and drives when she has to, but she prefers to have someone else drive. She has problems with her vision due to cataracts in her right eye that, according to Sorenson, are not yet amenable to surgery. She previously had cataract surgery in her left eye. (R. 390-91) Sorenson is a high school graduate. (R. 391) Her vision problems make it difficult for her to read at times, depending on lighting and the size of the print, and she sometimes uses a magnifying glass to read. She also has problems maintaining her concentration, and she sometimes reads the same sentence over and over again. She has taken medications for depression and anxiety that have helped her concentration problem, but after a period of time they either stop working or she has to stop taking them due to side effects. According to Sorenson, her doctors are continuing to try to find a medication that works well for her. (R. 393-94)

Sorenson described her past work experience as follows. She worked as an accounts payable clerk doing data entry, which involved entering vendors' invoices "into the computer to determine when they were to be paid." (R. 394) She worked as a receiving clerk, where she would go through orders delivered to a warehouse, confirm that the proper goods had been received, and split up the orders for delivery to different stores. The job required her to lift from five to seventy-five pounds. She worked as a stock clerk where she stocked merchandise in retail stores. The majority of this job required light lifting of housewares such as bed linens, dishes, towels, and the like. She worked as an inventory clerk, where she would go in and do inventory at various retail establishments. She used a small numerical keyboard that hung from her belt to enter the prices and the items. The job did not require any lifting. (R. 394-96)

Sorenson left her most recent job, the data entry position, due to anxiety and panic attacks. She stated her husband had died two years earlier after a battle with cancer, and six months after his death she was diagnosed with breast cancer. She had radiation treatments for the cancer. She felt she could not continue working full time, so her

employer allowed to try to part-time work. However, she still was not able to cope with working. She explained, "I'd just start[] getting anxiety attacks, shortness of breath, fright or flight, not being able to concentrate on my work the way I should be, not, not feeling safe, feeling that people were after me." (R. 397-98) She stated when she has a panic attack, she feels like she is "being suffocated," and "[i]t's either like a fight or a flight to where you either, if you don't get away from the situation you've got to fight your way out. Migraine headaches, nauseated, nausea." (R. 398) She stated her headaches are severe and prevent her from sleeping for long periods of time until they resolve. According to Sorenson, her doctor has indicated the headaches are part of her anxiety disorder. (R. 398-99)

Sorenson stated she gets panic attacks when she goes to Wal-Mart, to a doctor's office, or anywhere she is around people, including when she has more than three people at her home. She has checked her blood pressure at Wal-Mart when she is feeling anxious, and stated her blood pressure "will shoot up to like 160/90." (R. 401) According to Sorenson, a doctor has stated her headaches are caused by the elevated blood pressure. (*Id.*)

If Sorenson tries to stay in a situation when she begins to have a panic attack, she gets weak in the knees, her ears begin to ring, and she has fainted "a few times." (R. 399) The panic attacks last anywhere from an hour to a couple of days. She has intermittent problems with high blood pressure, and according to her, doctors have explained her blood pressure elevates during the panic attacks. She takes Prozac, but believes she should not take the drug because diabetes runs in her family and Prozac "can give false reading for your blood sugar for diabetes." (R. 400)

Sorenson stated her last employer was satisfied with her performance, and she got along well with her coworkers at first. But after she began getting sick and missing work, she started having problems getting along with coworkers and her supervisor. She felt

people were gossiping about her, and were resentful that she "was getting fulltime benefits even though [she] was only putting in part-time hours." (R. 401) Her belief that people were talking about her increased her anxiety. (R. 402) She did not become anxious if her supervisor gave her instructions about her job; however, she feels she now would respond with anxiety to that type of situation. She stated she has a panic attack even when her daughter asks for something. (R. 402-03)

Sorenson indicated she was experiencing anxiety during the hearing and wanted to "go out the door." She stated, "My stomach is turning. The heart rate is going. My ability to think here is just very overwhelming that I am making myself sit here." (R. 399-400) She becomes angry if anyone, including a family member, tells her she has to do something or corrects her. Her mother placed her in a group home at Cherokee Mental Health Institute for several years, beginning in her early teens after her father died, and continuing until she graduated from high school. According to Sorenson, her mother "didn't want to deal with [her] and [her] problems of growing up and being a teenager." (R. 392) Sorenson had two younger sisters for her mother to care for, and stated she "was the one that got thrown away." (*Id.*) She stated she lives a block away from her mother but they have not had a mother-daughter relationship since Sorenson "got put away." (R. 403)

Sorenson stated that although she is pre-diabetic and has to watch her diet, and she has high blood pressure, neither of those physical ailments would preclude her from working. What prevents her from working is her mental health. She stated she sleeps eighteen to twenty hours each day. She gets up to eat, go to the bathroom, or get something to drink, and then she goes back to bed. She may have a television on low volume for light noise, but she does not pay attention to the television. She has no social activities, and generally leaves her house only to see her doctors and therapist. She considers the upstairs two rooms of her house to be a "safe place," and that is where she

stays. She only shops when she is unable to find someone else to go shopping for her. (R. 404-07, 417) She does no housework, and described her house as a "[p]ig pen." (R. 406) A male friend lives with Sorenson in her house, and he takes care of the cooking and cleaning. Sorenson stated her friend was living with her until he could get a place of his own, and she considered him to be "like [a] brother." (R. 406) Sorenson previously had another friend living with her, but she "had to get rid of him" because "[h]e was starting to steal things from [her]." (R. 407-08)

Sorenson used to care for her grandson, but at the time of the ALJ hearing, she had not cared for the child in two years. She stopped caring for him because she began to feel anxious after the child had been with her for only a few minutes, and she would yell at him. (R. 408)

At one point, Sorenson attempted to start her own business, a medical billing service, which she planned to operate from her home. She found out about the opportunity on the Internet, and she sent out letters to solicit clients but never received any responses. (R. 408-09)

In April 2004, Sorenson was convicted in Kansas, on a charge of possession of methamphetamine. She was given one year of probation, which she completed successfully, and her supervision was terminated on April 13, 2005. (R. 344-57; 409-10) Sorenson stated she does not drink or use drugs; she was selling the methamphetamine "to make some money so [she] wouldn't have to use all of [her] savings." (R. 410) As part of her probation, Sorenson underwent a substance abuse evaluation. The testing indicated Sorenson was at a low probability of having a substance abuse disorder, and no treatment was recommended. (R. 343) Sorenson indicated that if it were not for her arrest and supervised probation, she likely would not have gotten the help she has received for her mental problems. (R. 409)

## 2.    *Sorenson's medical history*

Sorenson had a hysterectomy and unilateral salpingo-oophorectomy in about 1996, "for precancerous lesion of the cervix." (R. 186)  In January 2001, she was diagnosed with left breast cancer and underwent a lumpectomy.  (R. 168-85)  She underwent radiation treatments following the surgery, with resulting skin reaction and discomfort, and discomfort in her left shoulder requiring Hydrocodone for pain management.  (R. 188)  She also was started on Tamoxifen.  (*See* R. 216)  She did well, and six months after surgery, there was no evidence of persisting disease.  She "worked hard at regaining motion in her left shoulder," and by June 2001, she had regained "near full mobility" of the shoulder.  (R. 195)

In November 2001, Sorenson complained of continued fatigue.  She stated she felt exhausted after working for three to four hours.  She also complained of mild headaches.  Notes indicate her appetite was fair, her weight had been stable, and she had "not felt particularly depressed." (R. 215)

Mammogram results continued to show no recurrent disease in December 2001.  Notes at that time indicate Sorenson's weight was "down to 110 pounds."  (R. 194)  However, her fatigue was improving gradually.  (R. 215)  At a follow-up on June 11, 2002, her weight was 120 1/2.  She reported feeling well except for "feeling tired." (R. 193)  A December 2002 mammogram continued to show no recurrent disease.  In June 2003, she continued to report feeling well except for fatigue.  Her surgeon's notes indicate Sorenson's fatigue was better than it had been at the previous year's follow-up.  (R. 192)  However, she saw her family doctor on December 20, 2002, with complaints of increased fatigue.  She stated she wanted to "sleep all the time," she was having difficult getting out of bed, she lacked any ambition, and she wanted to go back to sleep frequently during the day.  Sorenson reported that she had "lost her job because of this excessive fatigue." (R. 213)  She denied any headaches, visual problems, or other problems.  She was caring

for her grandson during the day and was trying to start up her own business, but she was not having any success with this. The doctor indicated Sorenson's "unusually severe fatigue" could be due to depression, and he recommended she see a psychologist for a formal evaluation. Sorenson already was taking Effexor, an anti-depressant, for hot flashes, and the doctor indicated he would be willing to start her on a stronger anti-depressant, if indicated from the evaluation. (R .213)

Sorenson saw her doctor on June 23, 2003, reporting continued fatigue. Notes indicate she had discontinued her Tamoxifen because "it cost too much," and she also had discontinued her Effexor. The doctor "strongly recommended that she go back on tamoxifen," which he noted she might be able to get from Canada at cheaper price. (R. 210)

On March 23, 2004, Sorenson was seen for an intake evaluation at Lincoln Mental Health in Fort Dodge, Iowa. (R. 326-38) She began seeing Kaye Grossnickle, MSN, ARNP, for individual therapy one to two times monthly. She also saw a psychiatrist periodically for medication management. Her attendance was noted to be excellent. On May 18, 2004, Ms. Grossnickle noted Sorenson met the diagnostic criteria for Major Depressive Disorder, recurrent, moderate, without psychosis, and Post Traumatic Stress Disorder, chronic. She noted Sorenson's current GAF to be 50, and her highest GAF within the preceding year to be 50. She opined Sorenson would have marked difficulty carrying out instructions, and maintaining attention, concentration, and pace; moderate difficulty remembering and understanding instructions, procedures, and locations; and slight difficulty interacting appropriately with supervisors, coworkers, and the public, and using good judgment and responding appropriately to workplace changes. (R. 265)

Sorenson was seen by an oncologist at the University of Iowa on March 30, 2004, for initial consultation relating to her breast cancer. She complained of occasional left-sided chest pain, which she opined was related to her anxiety; occasional headaches;

"drenching night sweats"; shortness of breath upon exertion; and occasional diarrhea. Notes indicate the doctors planned to continue to monitor Sorenson's condition and schedule her for a mammogram, which was overdue. They did not restart her on tamoxifen, which she had not been taking for one year. (R. 249-50)

Sorenson saw Ms. Grossnickle on April 6, 2004. She reported continuing anxiety but reduced panic attacks, noting her panic attacks occurred usually upon confrontation. She was taking Paxil, and Ambien was prescribed as a sleep aid. She was noted to be alert, oriented, and cooperative, with intact memory and insight, although she complained that she could not concentrate long enough to read. Her GAF was assessed as 46. (R. 324-25)

Later the same day, Sorenson underwent a psychological evaluation by Dan L. Rogers, Ph.D., at the request of Disability Determination Services. (R. 252-55) Sorenson was "open and cooperative during the interview," and Dr. Rogers indicated his "present observations [could] be taken as an accurate reflection of her functioning." (R. 252) Sorenson stated she had "been depressed all [her] life." (R. 253) Dr. Rogers noted the following history:

> Now [Sorenson] lives in a house that she owns, with her dog and her cat. She has no social life and sees almost nobody except her daughter. She stays in her bedroom almost all the time and feels very anxious and fearful if she has to leave her home. She drives but she avoids shopping because she feels unsafe. She can figure change when she makes a purchase and she is able to handle a checkbook.
>
> Though she used to read a lot, she is no longer able to concentrate on what she reads. Her television is turned on most of the time, but she really doesn't watch it much. [She] does not keep her housework done and her home is a mess, and she cooks very little. Days are unstructured and she sleeps most of the time, from about 6:30 most evenings until noon the next day.

(*Id.*)  Sorenson indicated she had stopped working in June 2002, because her depression had increased "and interpersonal stress became unbearable."  (*Id.*)

Dr. Rogers recorded the following observations concerning Sorenson's mental status:

> Today [Sorenson] was dressed and groomed neatly and appropriately.  She was thin and she gave the appearance of being in only fair health.  She was cooperative and open in her discussions and facial expressions were congruent with the conversation.  She was nervous and agitated and she seemed to be fatigued.
>
> Speech was normal in rate and volume and prosody was unremarkable.  Content of her conversation was average in breadth and depth and her fluency and articulation were good.  Thoughts were logically connected and goal directed.  She denied hallucinations and there were no signs of delusions, obsessions, or compulsions.  Insight and judgment seemed to be fair.
>
> [Sorenson] seemed to be depressed today, consistent with her description of constant depression.  Emotional reactions were appropriate and range of affect was normal.  She displayed many signs of vegetative depression, including sleeping  much of the day, anhedonia, social withdrawal, diminished activity, lack of concern for her environment, and pervasive sadness.  She has frequent thoughts and impulses to suicide, but she has never attempted suicide.  She mostly feels that she would just like to not wake up again.
>
> She was oriented today to time, place, and person.  Attention was only fair and her concentration was poor, largely because she was preoccupied with her problems.  Immediate retention was fair to poor but she had no problems with recall of personal information or recent and remote facts.  She seemed to be of average intellect.  She was mildly concrete in her thinking but she was able to understand common proverbs, absurdity, and humor.  Simple, mental calculations were difficult for her. . . .

(R. 254)

Dr. Rogers diagnosed Sorenson with "Major depression without mention of psychosis," Agoraphobia," and "Schizoid personality disorder," and he assessed her GAF at 45-50.[1] (R. 255) He reached the following conclusions from his evaluation:

> [Sorenson] appears to have been quite depressed for some time. There are no signs of psychosis, but she has vegetative behaviors and thinks of suicide often, though she has never attempted it. By her description, the depression has been virtually lifelong, but quite a bit worse in the past few years.
>
> It would be difficult for her to understand instructions, procedures, and locations, unless there were repetition or her depression were much better. Her pace is very poor and attention and concentration are impaired, which would make it difficult for her to carry out instructions. She cannot interact appropriately with supervisors, coworkers, or the public. Judgment is only fair and she would not be able to adjust to changes in the work place.
>
> [Sorenson] is able to handle cash benefits.

(R. 254-55)

Sorenson saw Ms. Grossnickle on April 20, 2004. She reported her mood was better but she still had panic attacks when she became upset. Her medications were noted to be Paxil and Seroquel. Her GAF was 50. (R. 322-23)

On April 27, 2004, psychologist Myrna C. Tashner, Ed.D. reviewed the record and completed a Mental Residual Functional Capacity Assessment form (R. 256-59), and a Psychiatric Review Technique form (R. 268-82). Dr. Tashner found evidence to support diagnoses of Major Depression without mention of psychosis; Agoraphobia; and Schizoid

---

[1] "A GAF between 41 and 50 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Morgan v. Commissioner of Social Security*, 169 F.3d 595, 598 n.1 (9th Cir. 1999).

Personality Disorder. (R. 271, 273, 275) She found Sorenson to be markedly limited in her ability to interact appropriately with the general public, and moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting. She found no significant limitations in Sorenson's other work-related mental functional abilities. (*Id.*)

In Dr. Tashner's summary comments, she noted the evidence suggests Sorenson has a severe mental impairment, but not one that meets or equals Listing level. She indicated Sorenson's credibility was eroded by her lack of mental health treatment, and what Dr. Tashner viewed as a failure to be forthcoming with Dr. Rogers about seeing a counselor. She found Dr. Rogers's GAF to be more restrictive than Sorenson's activities of daily living indicated. (R. 282)

Sorenson saw Ms. Grossnickle on May 17, 2004. She reported she was sleeping better on the Seroquel, her appetite was good, and she had gained a little weight. She reported sleeping about twelve hours per day. Her GAF was assessed at 50. (R. 320-21) Sorenson saw the therapist again on June 18, 2004. Her application for disability had been denied. She stated she was sleeping all the time, her anxiety had increased, and she had had some panic attacks. She stated she felt like she was "back to square one." (R. 318) The therapist noted Sorenson was "Decompensated." Sorenson was having dreams of suicide and difficulty concentrating. Her Paxil dosage was increased. Her GAF was assessed at 46. (R. 319)

Sorenson returned to see Ms. Grossnickle on July 2, 2004. She was still sleeping all the time and she was not taking the Seroquel. She reported a panic attack two weeks

earlier, and she was having dreams of suicide. The therapist prescribed Lexapro in addition to the Paxil, with a view toward gradually switching Sorenson to the Lexapro. She assessed Sorenson's GAF at 42. (R. 316-17)

On July 20, 2004, Ms. Grossnickle opined Sorenson's current GAF was 42. Her diagnoses remained unchanged, and there also was no change in the therapist's opinion regarding Sorenson's job-related impairments. (R. 260)

Sorenson saw Ms. Grossnickle on July 30, 2004. She was sleeping a lot. Her appetite was good. Sorenson had missed a meeting with her probation officer and this caused her to become panicky. Sorenson reported her dog had scratched a child, and Sorenson was "angry at people who made [the] dog [go] to jail." (R. 314) She was switched fully to the Lexapro, discontinuing the Paxil. Her GAF was assessed at 42. (R. 315)

On August 20, 2004, Sorenson's mood was still depressed and she reported having no energy. She was a little calmer since starting the Lexapro, but found it harder to get to sleep. Her Lexapro dosage was increased, and she was referred to a different therapist for individual counseling. Her GAF was assessed at 40. (R. 312-13)

On September 10, 2004, Sorenson reported she was sleeping all the time, and she had experienced three panic attacks the previous week. She did not want to be around people and was experiencing a lot of stress, particularly around her upcoming disability hearing. Her Lexapro dosage was increased again, and her GAF was assessed at 40. (R. 310-11)

On October 15, 2004, Sorenson reported that her tension level increased whenever she had to leave her house. She indicated the Lexapro was helpful in "tak[ing the] edge off." (R. 307) Her GAF was assessed at 42. (R. 308)

On November 19, 2004, Sorenson reported she was still sleeping all the time. Her mood remained depressed and anxious. She had begun having headaches and chest

tightness that she attributed to the Lexapro, so she had stopped taking it two weeks earlier. She was started on Zoloft. Her GAF was assessed at 40. (R. 305-06)

On December 2, 2004, Sorenson reported that her sleep was "better," but she was having "weird dreams." (R. 303) She continued to experience some depression and anxiety. She was attending counseling sessions as directed. She was continued on Zoloft, and her GAF was assessed at 48. (R. 303-04)

On January 7, 2005, Sorenson's mood was "pretty good," but she still did not like to leave her house. She reporting sleeping better on the Zoloft than she had on the Lexapro. Her Zoloft dosage was increased. Her GAF was assessed at 50. (R. 301-02)

On February 23, 2005, her mood was better. She still rarely left her house. She continued to see her therapist. Her GAF was assessed at 50. (R. 299-300)

On April 22, 2005, Sorenson reported increased nightmares. She was experiencing stress surrounding her lack of income. She was not answering her phone or leaving her house. She reported some thoughts of suicide, but with no plan. The nurse practitioner noted Sorenson's assessment as "decompensated," and assessed her GAF at 45. She decreased Sorenson's Zoloft dosage and added Effexor. (R. 297-98)

On May 27, 2005, Sorenson reported the Effexor kept her awake, gave her a "nonstop headache," and made her toss and turn all night. She also did not believe it was helping her anxiety. Sorenson still was not leaving her house. She noted her car had been repossessed the previous week. She stated she sometimes did not want to wake up. The Effexor was discontinued, and she was started on Remeron. Her GAF was assessed at 40. (R. 294-95)

On June 24, 2005, Sorenson reported she was sleeping thirteen to fourteen hours per day, and she had "bizarre dreams." Her mood was better, but she still had some anxiety attacks and continued to avoid being around people. She had kicked her roommate out of the house and was not feeling as depressed. It appears (but is not clear) that her

Remeron dosage was decreased because it was deemed "too sedating." (R. 292-93) Sorenson's GAF was assessed at 50. (R. 293)

On September 28, 2005, Sorenson reported the lower Remeron dosage had reduced her sleep time but caused her to toss and turn. Her anxiety had increased. She had flown to Phoenix to visit friends but this increased her anxiety. Her appetite was slightly reduced. She continued to see her therapist regularly. Her GAF was assessed at 50. (R. 290-91)

On November 23, 2005, Sorenson reported increased anxiety and irritability. She stated she had a friend who was taking care of her. She was started on Celexa. Her GAF was assessed at 50. (R. 288-89)

On December 21, 2006, Sorenson reported irritability and pacing on the Celexa. The Celexa was discontinued, and Sorenson was started on Prozac. Her GAF remained at 50. (R. 285-86)

On January 18, 2006, Sorenson reported increased anxiety, indicating she had gotten "worked up" over her upcoming disability hearing. Her Prozac dosage was reduced. Her GAF remained unchanged at 50. (R. 283-84)

From August 2004 through January 2006, Ms. Grossnickle's progress notes indicate Sorenson was seeing another therapist, Judy Christianson, for counseling. However, the court was unable to locate any progress notes from Ms. Christianson in the record.

### 3. *Vocational expert's testimony*

The ALJ asked VE William Tucker the following hypothetical question:

> I'd like the Vocational Expert to initially consider what effects it would have on the claimant's ability to perform work activity if the claimant had some impaired vision because of cataracts, which prevented work in dark areas or good binocular vision. She should also not have to read fine print. The claimant should not work in areas of excessive noise.

Work should be simple, routine, repetitive, involve no interaction with the public. The work should involve no more than superficial interaction with coworkers when she is performing her job duties. Other workers may be present in the work area if it's not crowded. In order to avoid excessive stress, the work should not involve very fast mental pace, any strict guidelines, the need to handle emergency situations or complaints or direct the work of others. He [sic] should not be required to remember detailed information or data to complete her job duties or to relate or perceive [sic] information or data to others. With those limitations, could she return to any of her past relevant work?

(R. 413-14) The VE indicated the person described could not return to any of Sorenson's past relevant work. He noted her past work "involved dealing with fine print and some places she was dealing with the public." (R. 414) However, noting Sorenson is a younger individual with a high school education, the VE stated she could do other light, unskilled work such as laundry folder, production assembler, or inspector and hand packager. (*Id.*)

The ALJ asked the VE to consider what effect it would have on the claimant's ability to perform these jobs "if she would frequently be unable to complete her work tasks or tend to her work site or remain at the work site because of panic attacks and her headaches[.]" (R. 415) The VE stated "if this happened on a frequent basis, this would eliminate the jobs that [he had] recited and any other that [he] could identify." (*Id.*)

Sorenson's attorney asked the VE the following hypothetical question:

I want you to assume a younger individual with a high school education. Who has impaired vision that relates to inability to do work in dark areas, would preclude jobs that required good binocular vision, and the inability to read in fine print. The hypothetical person would be able to do only simple, routine tasks with no changes in that routine, no, would not be able to do any independent decisions within that type of job. Would work only at a slow pace, would require frequent supervision with frequent being at least six times a day. Frequent inability to remember to carry out instructions.

> The individual would have no contact with the public and at best only occasional interaction with coworkers. Under that hypothetical, would the person be able to do any other past relevant work?

(R. 415-16) The VE indicated the individual would be unable to perform any of Sorenson's past relevant work, and she would have no transferable skills. The VE stated "the slow pace and the requirement of frequent supervision would reduce [the hypothetical individual] to some kind of a sheltered work type working arrangement." (R. 416)

### 4.     The ALJ's decision

The ALJ found Sorenson had not engaged in substantial gainful activity since her alleged disability onset date. He found her to have severe impairments consisting of cataracts, depression, agoraphobia, personality disorder, and post-traumatic stress disorder, but he further found her impairments, either singly or in combination, did not meet or equal Listing level. (R. 18)

The ALJ found Sorenson's subjective complaints not to be fully credible. He found she had "made inconsistent statements regarding matters relevant to the issue of disability," failed to follow up on certain recommendations made by her treating sources, and was not compliant in taking prescribed medications. (R. 22) He found Sorenson's trip to Phoenix to visit friends to be evidence "suggesting the alleged symptoms and limitations may have been overstated." (*Id.*) He further found Ms. Grossnickle's report to be inconsistent, "particularly with respect to mental status examination assessments versus GAF scores, therefore rendering it less persuasive." (*Id.*) He therefore gave Ms. Grossnickle's report little weight. He also gave little weight to the consulting opinion of Dr. Rogers, finding the doctor "did not have the benefit of reviewing other medical reports contained in the current record," and further finding Dr. Rogers had relied heavily on Sorenson's subjective reporting of her symptoms and limitations. (*Id.*)

The ALJ gave great weight to the opinions of state agency consultant Myrna Tashner, Ed.D. (*see* R. 256-59; 268-82), and the opinions of the state agency medical consultant summaries in connection with the denials of Sorenson's application (R. 266-67), in concluding Sorenson retains the following residual functional capacity:

> [T]he claimant has the residual functional capacity to perform simple, routine, repetitive work involving no interaction with the public and no more than superficial interaction with co-workers while performing job duties, although other workers may be present in the work area if it is not crowded. In order to avoid excessive stress, the work should not involve a very fast mental pace, any strict guidelines, or the need to handle emergency situations or complaints or direct the work of others. The individual should not be required to remember detailed information or data to complete the job duties or to relate detailed information or data to others. The individual should avoid work requiring good binocular vision, reading fine print, or work in dark areas due to impaired vision secondary to cataracts, and avoid excessive noise.

(R. 18; *see* R. 22)

Based on this RFC, the ALJ concluded Sorenson is unable to return to any of her past relevant work, but based on the VE's testimony, the ALJ concluded Sorenson would be able to perform light, unskilled occupations such as laundry folder, production assembler, and inspector, hand packager. (R. 23, 24) He therefore found Sorenson not to be disabled. (R. 24)

## III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

### A. Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can

be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *Hillier v. Social Security Admin.*, 486 F.3d 359, 363 (8th Cir. 2007); *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, *supra*, 2007 WL 2593631 at *2 (citing *Bowen v. Yuckert*, 482 U.S. 137, 107 S. Ct. 2287, 98 L. Ed. 2d 119 (1987)).

The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and

speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)). *See Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) ("'The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work.' *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001), *citing Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996)."); *accord Kirby, supra*, 2007 WL 2593631.

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon, supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical

history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

## B. The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citing *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999), in turn citing *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998)); *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Page* 484 F.3d at 1042 ("Substantial evidence is relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's conclusion." Quoting *Haggard*, 175 F.3d at 594); *Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Krogmeier*, 294 F.3d at 1022. The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline*, *supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health &*

*Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier,* 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *accord Page*, 484 F.3d at 1042-43 (citing *Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004); *Travis v.. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007); *Cox v. Barnhart*, 471 F.3d 902, 906 (8th Cir. 2006)).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823

F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1)      the claimant's daily activities;
> 2)      the duration, frequency and intensity of the pain;
> 3)      precipitating and aggravating factors;
> 4)      dosage, effectiveness and side effects of medication;
> 5)      functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

## IV. DISCUSSION

Sorenson argues the ALJ erred in assessing her residual functional capacity ("RFC"). In a related argument, she asserts that because the hypothetical question posed to the VE was based on the ALJ's erroneous RFC determination, the VE's opinion based on the hypothetical question cannot be substantial evidence. Specifically, she argues the ALJ's RFC assessment is correct as far as it goes; however, the ALJ failed to include

certain other "critical" factors. (Doc. No. 6, pp. 7-8) She claims the RFC should have included the fact that she "is incapable of interacting appropriately with supervisors," and her need for repetitive instructions, as found by Dr. Rogers. (*Id.*, p. 8) She notes Ms. Grossnickle found three episodes of decompensation, all based on seemingly ordinary circumstances with which Sorenson was unable to cope, and she claims the ALJ should have included something in his RFC assessment, or in the hypothetical question to the VE, concerning her inability to cope with even marginal changes in her environment. (*Id.*, pp. 8-9) She also argues three episodes of decompensation would cause her to meet Criteria C of Listing 12.04. (*Id.*, p. 10) Sorenson further argues the RFC should have included Ms. Grossnickle's assessment that Sorenson has a marked inability to maintain attention, concentration and pace. These arguments all amount to a claim that the ALJ erred in failing to give appropriate weight to the opinions of Dr. Rogers and Ms. Grossnickle in assessing Sorenson's RFC.

The Commissioner responds that the ALJ included limitations in Sorenson's RFC that he found to be supported by and consistent with the record. He argues the ALJ was justified in failing to give great weight to Dr. Rogers's opinions because Dr. Rogers was a one-time consultative examiner, and he "had nothing against which to evaluate the veracity and consistency of the claimant's reports." (Doc. No. 7, p. 5; *see id.*, pp. 2-5) The Commissioner further asserts Dr. Rogers's opinions and those of Ms. Grossnickle were inconsistent with each other, noting Ms. Grossnickle indicated Sorenson has only a slight limitation of her ability to interact with supervisors appropriately, while Dr. Rogers found she is incapable of interacting with supervisors appropriately. Dr. Rogers also opined Sorenson would be unable to understand instructions, procedures, and locations without repetition, while Ms. Grossnickle opined she would have only a slight impairment in these abilities. (*Id.*, p. 7)

The Commissioner also denies Sorenson has had three episodes of "decompensa-tion." Instead, he claims Ms. Grossnickle documented three episodes of "situational stressors" and their effect on Sorenson. He further notes Ms. Grossnickle actually found Sorenson to be "clinically stable" on one of those occasions, and nothing in her progress notes indicate any of the situational stressors lasted for an extended period of time. (*Id.*) The Commissioner argues the GAF scores recorded by Ms. Grossnickle have only limited utility in the disability determination "because an individual can have minimal psychopathology, but still rate low on the GAF scale." (*Id.*, p. 8, citing *American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders* at 32-33 (4th ed. 1994) ("*DSM-IV*")). He further asserts "a GAF Score is a conclusory statement that does not give any information about the nature of the impairment, the prognosis, the symptoms, or what the claimant can still do despite the impairment," and therefore, the scores are "not persuasive evidence of disability." (*Id.*)

The Commissioner argues that although Ms. Grossnickle had a long-term treatment relationship with Sorenson, at the time the nurse practitioner rendered her opinion in July 2004, she had only been treating Sorenson for two months, and therefore, her opinion was not entitled to the same degree of deference it might have been after a longer treatment relationship. (*Id.*, p. 9, citing *Randolph v. Barnhart*, 386 F.3d 835, 840 (8th Cir. 2004)). In addition, the Commissioner notes the ALJ's RFC assessment included many of the limitations reported by Ms. Grossnickle. Further, the Commissioner argues that because the hypothetical question posed to the VE contained all of Sorenson's limitations the ALJ found credible, the question was proper, and the VE's response constitutes substantial evidence that Sorenson is not disabled. (*Id.*, p. 10)

In reply, Sorenson argues the ALJ failed to support his RFC assessment with citations to the record, and she claims she cannot find the source for some of the limitations the ALJ included in the RFC assessment. She argues that at best, the ALJ's

RFC assessment may have come from the opinion of the state agency consultant who did a paper review of the record in April 2004.

Sorenson notes the record contains three types of medical opinions: those from non-examining doctors, those from consulting physicians, and those from treating medical sources. She asserts the opinions of the non-examining doctors, upon which the ALJ relied, are based, in large part, on Dr. Rogers's opinions, with which the consultants then disagree. Sorenson argues it was error for the ALJ to adopt the opinion of a non-examining physician over that of an examining physician when the non-examining physician fails to provide any support for his disagreement with the examining physician. (Doc. No. 8, pp. 4-5) Sorenson further cites case law for the proposition that her GAF scores can, standing alone, demonstrate that she is unable to perform competitive work. At the least, she argues the case should be remanded for further evaluation by the ALJ of her GAF scores that consistently fell at or below 50 – a GAF score she notes one court has held "'does suggest an inability to keep a job.'" (*Id.*, p. 6, quoting *Lee v. Barnhart*, 117 Fed. Appx. 674, 678 (10th Cir. 2004))

Addressing this last argument first, the court notes the Commissioner "has declined to endorse the [GAF] score for 'use in the Social Security and SSI disability programs,' and has indicated that [GAF] scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" *DeBoard v. Comm'r of Soc. Sec.*, 211 Fed. Appx. 411 (6th Cir. 2006) (quoting *Wind v. Barnhart*, 133 Fed. Appx. 684, 691-92 n.5 (11th Cir. 2005), in turn quoting 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)). Nevertheless, GAF scores are used by medical professionals "to consider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *Sykes v. Astrue*, slip op., 2008 WL 619216 at *5 n.4 (E.D. Mo. March 3, 2008) (quoting *Bridges v. Massanari*, 2001 WL 883218, *5 n.1 (E.D. La. July 30, 2001)) (internal quotation marks omitted). Thus, GAF scores cannot be correlated directly to a claimant's mental

status from day to day, just as the scores cannot be correlated directly to the severity requirements of the mental disorders Listings.

The ALJ discounted the GAF scores recorded by Ms. Grossnickle because he found those scores to be inconsistent with Ms. Grossnickle's concurrent observations of Sorenson's mental status. (R. 22)  The two are not inconsistent.  Because the GAF score addresses functioning along the entire continuum of mental health, it is not reflective merely of a patient's mental status at the time of the examination.  Thus, for example, there is no inconsistency between Ms. Grossnickle's assessment of Sorenson's GAF at 40 while noting Sorenson's affect to be "Appropriate" and her mood to be "Euthymic" (R. 312-13), or an assessment of Sorenson's GAF at 50 with a similar observation of Sorenson's mood and affect.  (R. 301-02)

In the present case, Sorenson's GAF scores were recorded between 40 and 50 from March 2004, until the most recent record in January 2006.  In April 2004, from his evaluation of Sorenson, Dr. Rogers recorded a similar GAF of 45-50.  Nearly every court, including the Eighth Circuit Court of Appeals, has taken notice of the *DSM-IV*, which explains that "'[a] GAF between 41 and 50 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).'" *Morgan v. Commissioner of Social Security*, 169 F.3d 595, 598 n.1 (9th Cir. 1999) (quoting *DSM-IV* at 34).  *See, e.g.*, *Cox v. Astrue*, 495 F.3d 614, 620 n.5 (8th Cir. 2007) (noting, "[f]or added context, . . . a GAF score in the forties may be associated with a serious impairment in occupational functioning.") (citing *DSM-IV*, 2000 rev., at 34); *Brueggemann v. Barnhart*, 348 F.3d 689, 695 (8th Cir. 2003) (GAF score of 50 "reflects serious limitations in the patient's general ability to perform basic tasks of daily life, and . . . the VE considered a claimant with a GAF of 50 unable to find any work"); *Wilson v. Astrue*, 493 F.3d 965, 968 (8th Cir. 2007) ("GAF and full scale IQ scores are certainly

pieces of the hypothetical puzzle necessary to gain an accurate overall assessment of [a claimant's] functioning"); *Lacroix v. Barnhart*, 465 F.3d 881, 883-84 (8th Cir. 2006) (considering *DSM-IV*'s explanation of the meaning of various GAF scores in assessing claimant's mental abilities). *See also Givens v. Astrue*, 251 Fed. Appx. 561, 564 n.1 (10th Cir. 2007) (quoting *DSM-IV* definition of GAF scores); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745 (6th Cir. 2007) (same); *Boyd v. Apfel*, 239 F.3d 698, 700 n.2 (5th Cir. 2001) (same). *But see Lee v. Barnhart*, 117 Fed. Appx. 674, 678 (10th Cir. 2004) ("Standing alone, a low GAF score does not necessarily evidence an impairment seriously interfering with a claimant's ability to work."); *Hudson ex rel. Jones v. Barnhart*, 345 F.3d 661, 666 (8th Cir. 2003) (ALJ could rely on medical expert's opinion that claimant's limitations were less significant than GAF scores indicated); *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002) ("While a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy.").

The courts' recognition of the relevance of GAF scores does not, however, require the ALJ to rely on the scores. Particularly where, as here, there is no indication that a particular GAF score was assigned because Ms. Grossnickle perceived any particular impairment in Sorenson's ability to work, the GAF scores, standing alone, do not establish that Sorenson's ability to work was impaired. Indeed, the *DSM-IV*'s explanation of GAF scores reflects that a GAF of 41-50 "reflects the assessor's opinion that the subject has serious symptoms *or* serious impairment of social or occupational functioning." *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 511 (6th Cir. 2006). There is no indication in Ms. Grossnickle's treatment notes to indicate whether her GAF assessments related to Sorenson's symptoms or to impairment of her social or occupational functioning. On the other hand, Dr. Rogers's report contains a careful analysis of Sorenson's functional abilities in the workplace that appears to correlate closely with his GAF assessment of 45-50.

The ALJ discounted Dr. Rogers's overall opinion because he found Dr. Rogers relied heavily on Sorenson's subjective complaints, which the ALJ found not to be reliable. However, Sorenson's subjective complaints during the evaluation were consistent with her longitudinal complaints to Ms. Grossnickle over time. The court finds some of the "contradictions" the ALJ relied upon in discounting Sorenson's credibility are not, in fact, contradictions. For example, the ALJ noted Sorenson "initially reported she lost her job due to excessive fatigue to her treating physician," but later, "she reported losing her job due to depression and interpersonal stress to the consulting examiner." (R. 22) These two reports are not inconsistent. Indeed, depression and interpersonal stress could be the underlying causes of Sorenson's fatigue. The court finds the ALJ's reliance on this factor to be a hypertechnical comparison of the two reports and an insufficient basis to discount Sorenson's subjective complaints.

Further, the court finds the ALJ erred in failing to consider adequately Sorenson's consistent reports regarding her daily activities. The fact that Sorenson made a single trip to Phoenix to visit friends does little to "suggest[] the alleged symptoms and limitations may have been overstated." (*Id.*) Indeed, Sorenson reported that the trip increased her anxiety level. There is nothing in the record to contradict Sorenson's report that she spends the majority of her time sleeping, and she isolates herself as much as possible from contact with the outside world. The evidence of record is consistent with Sorenson's GAF scores, and suggests Sorenson is far more limited than the ALJ concluded.

The ALJ also gave Dr. Rogers's opinion little weight because the doctor "did not have the benefit of reviewing other medical reports contained in the current record." (R. 220) However, the ALJ gave great weight to the opinions of the state agency medical consultants. Notably, the state agency consultants also conducted their reviews in 2004, so they, like Dr. Rogers, did not have the benefit of the next two years' treatment notes.

The court finds the state agency consultants' opinions do not constitute substantial evidence upon which to base a determination of Sorenson's RFC.

The hypothetical question the ALJ asked the VE included the limitations the ALJ found to be credible. However, because the ALJ failed to consider Sorenson's subjective complaints adequately, he failed to include in the hypothetical question certain significant limitations, particularly those relating to Sorenson's difficulty maintaining attention, concentration, and pace, and her need for frequent supervision. When a VE's testimony is based on a hypothetical question that fails to include all of a claimant's limitations, the VE's response cannot constitute substantial evidence to support a finding that the claimant is able to work. *Cox v. Astrue*, 495 F.3d 614, 620 (8th Cir. 2007). It is clear from the VE's testimony that when these limitations are added to the RFC as found by the ALJ, Sorenson would be unable to work. (*See* R. 416)

The record as a whole contains overwhelming evidence that Sorenson is disabled. Where the record overwhelmingly supports such as finding, remand would merely delay the receipt of benefits to which Sorenson is entitled. Accordingly, reversal and remand for an immediate award of benefits would be appropriate in this case. *See Buckner v. Apfel*, 213 F.3d 1006, 1011 (8th Cir. 2000); *Thompson v. Sullivan*, 957 F.2d 611, 614 (8th Cir. 2002).

## V. CONCLUSION

For the reasons discussed above, **IT IS RESPECTFULLY RECOMMENDED**, unless any party files objections[2] to the Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1) and Fed. R. Civ. P. 72(b), within ten (10) days of the service of

---

[2]Objections must specify the parts of the report and recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72.

a copy of this Report and Recommendation, that the Commissioner's decision be reversed and this case be remanded for calculation and immediate award of benefits.

**IT IS SO ORDERED.**

**DATED** this 17th day of March, 2008.

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT